**In re Sharon Elizabeth SULLIVAN, Relator.**

No. 14–04–00514–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 24, 2005.

Peggy Sue Bittick, Carrie Suzanne Holman, Pearland, for appellants.

Don Cruse, Austin, Ellen Yarrell, Sallee S. Smyth, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices FROST and GUZMAN.

**SUBSTITUTE MAJORITY OPINION**

KEM THOMPSON FROST, Justice.

This original proceeding presents a question of first impression under the Texas Family Code: *Does an unmarried man who donated sperm to an unmarried woman for the conception of a child have standing to maintain a proceeding to adjudicate parentage of the resulting child?*

Relator Sharon Sullivan seeks a petition for writ of mandamus commanding the respondent, the Honorable Bonnie Hellums, Judge of the 247th Judicial District Court of Harris County, to (1) vacate her order denying Sullivan's plea to the jurisdiction and (2) dismiss for lack of standing the proceeding to adjudicate parentage filed by real party in interest Brian Keith Russell. We conclude that, under section 160.602(3) of the Texas Family Code, the respondent did not clearly abuse her discretion in ruling that Russell has standing to maintain a proceeding to adjudicate parentage. Accordingly, we deny Sullivan's petition for writ of mandamus.

## I. Factual and Procedural Background

Sullivan is an unmarried woman. Russell is an unmarried man. Neither has been married previously. Sullivan wanted to conceive a child. Russell agreed to provide his sperm so that Sullivan could be artificially inseminated. Russell and Sullivan signed a "Co–Parenting Agreement"

on February 6, 2003,[1] which recites these facts and, in addition, states the following:

3. BRIAN KEITH RUSSELL has agreed to provide his semen to SHARON SULLIVAN for the purpose of donor insemination.
4. Each party agrees that SHARON SULLIVAN's decision to conceive and bear a child was actually a joint decision of the parties and based upon the commitment of each party to parent the child.
5. Each party agrees that, during the calendar year 2003, SHARON SULLIVAN will attempt to become pregnant through the procedure of donor insemination, and that such inseminations will continue until conception occurs.
6. Each party agrees that any child born as a result of the donor insemination procedure will be the child of BRIAN KEITH RUSSELL as if he and SHARON SULLIVAN were married at the time of conception, and that BRIAN KEITH RUSSELL will be named as the father on the child's birth certificate.

. . .

11. The parties agree that SHARON SULLIVAN shall provide the primary residence for the child as long as she is able to do so. The parties agree that BRIAN KEITH RUSSELL shall have possession of the child at any and all times mutually agreed to in advance by the parties. Failing mutual agreement, BRIAN KEITH RUSSELL shall have possession of the child under the specified terms set out the [sic] Standard Possession Schedule attached to this agreement and incorporated herein.

Insemination and conception were successful in June 2003, and the resulting child, L.J.S., was born on March 2, 2004. However, before the child's birth, a disagreement arose between Russell and Sullivan, and on March 31, 2004, Russell filed an "Original Petition to Adjudicate Parentage, Suit Affecting the Parent–Child Relationship and Breach of Contract" in the trial court. In this pleading, Russell alleges he is L.J.S.'s father and seeks the following relief:

(1) a decree establishing a parent-child relationship between L.J.S. and Russell;

(2) an order appointing Russell and Sullivan as joint managing conservators of L.J.S.;

(3) temporary orders appointing Russell and Sullivan as joint managing conservators of L.J.S., ordering Sullivan to submit L.J.S. for genetic testing to affirm the parentage, and ordering that a standard possession order be put in place and that visits between Russell and L.J.S. begin immediately;

(4) injunctive relief preventing Sullivan from hiding L.J.S., removing L.J.S. from a geographical boundary to be defined by the court, and from using for any purpose, especially conceiving a child, any frozen or preserved sperm from Russell; and

(5) attorney's fees and recovery for breach of contract and promissory estoppel, including damages for mental anguish.

1. Sullivan was not represented by counsel when she signed the agreement, which was drafted by an attorney retained by Russell. Although the parties exchanged drafts of a modified agreement that purportedly would have replaced their "Co–Parenting Agreement," the parties never reached agreement as to any amendment, revocation, or modification of their original agreement.

Sullivan filed a plea to the jurisdiction, claiming that under the Texas Family Code, Russell lacks standing to bring a proceeding to adjudicate parentage because he is a sperm donor with no parental rights. After a hearing, the trial court ruled that Russell had standing and denied Sullivan's plea to the jurisdiction. Sullivan then filed a petition for writ of mandamus in this court alleging that the trial judge clearly abused her discretion by finding that Russell has standing to maintain a proceeding to adjudicate his parentage of L.J.S.

## II. Standard of Review

To obtain mandamus relief, Sullivan, as the relator, must demonstrate (1) that the lower court committed a clear abuse of discretion, (2) for which there is no adequate remedy at law, such as a normal appeal. *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992). Both Russell and Sullivan agree that Sullivan would have no adequate remedy at law if the trial court clearly abused its discretion.[2] In deciding whether the trial court clearly abused its discretion in determining that Russell has standing to maintain a proceeding to adjudicate parentage (hereinafter "parentage proceeding"), we do not consider the underlying merits of the case.

## III. Analysis

Standing is a prerequisite to subject-matter jurisdiction, which is essential to a court's power to decide a case. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 553–54 (Tex.2000). A party may challenge the absence of subject-matter jurisdiction by a plea to the jurisdiction and by other procedural vehicles. *Id.* at 554. A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat the alleged claims, without regard to whether they have merit. *Id.* The purpose of a dilatory plea is not to force a plaintiff to preview its case on the merits, but to establish a reason why the merits of its case should never be reached. *Id.* The Texas Supreme Court has emphasized that a court should not decide standing issues based on its views of the merits:

> In deciding a plea to the jurisdiction, a court may not weigh the claims' merits but must consider only the plaintiffs' pleadings and the evidence pertinent to the jurisdictional inquiry. When we consider a trial court's order on a plea to the jurisdiction, we construe the pleadings in the plaintiff's favor and look to the pleader's intent.

*Id.* at 554–55.

A trial court accepts the factual allegations in the petition as true, unless the defendant pleads and proves the allegations were made fraudulently to confer jurisdiction. *Id.* at 554; *TAC Realty, Inc. v. City of Bryan,* 126 S.W.3d 558, 561 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). When reviewing a trial court's order on a plea to the jurisdiction, an appellate court may look to evidence outside of the pleadings:

> [T]he issues raised by a dilatory plea are often such that they cannot be resolved without hearing evidence. And because a court must not act without determining that it has subject-matter jurisdiction to do so, it should hear evidence as necessary to determine the issue before proceeding with the case. But the proper function of a dilatory plea does not authorize an inquiry so far into the substance of the claims presented that

2. Although the parties are in agreement on this issue, we need not and do not determine whether Sullivan has an adequate remedy at law because we conclude that the trial court did not clearly abuse its discretion and deny mandamus relief on that basis.

plaintiffs are required to put on their case simply to establish jurisdiction.

. . .

The court should, of course, confine itself to the evidence relevant to the jurisdictional issue.

*Bland Indep. Sch. Dist.*, 34 S.W.3d at 554–55.

Standing is a constitutional prerequisite to suit in both federal courts and the courts of Texas. *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex.2001). Nonetheless, the judge-made criteria regarding standing do not apply when the Texas Legislature has conferred standing through a statute. *Id.* In statutory standing cases, such as this, the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls in that category. *See Tex. Dep't of Protective and Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 859–61 (Tex.2001) (determining whether putative father had standing to maintain a suit affecting the parent-child relationship based solely on construction of statutory standing provision).

Russell asserts that he has standing under a statute that allows "a man whose paternity of the child is to be adjudicated" to maintain a parentage proceeding. *See* Tex. Fam.Code Ann. § 160.602 (Vernon Supp.2004). It is undisputed that Russell is a man, but Sullivan asserts that Russell is not "a man whose paternity is to be adjudicated" because, Sullivan claims, Russell is a "donor" who lacks parental rights and standing to maintain a parentage proceeding. *See* Tex. Fam.Code Ann. § 160.102(6) (Vernon 2002) (defining "donor" as "an individual who produces eggs or sperm used for assisted reproduction, regardless of whether the production is for consideration" but excluding from this definition "a husband who provides sperm or a wife who provides eggs to be used for assisted reproduction by the wife ... or ... a woman who gives birth to a child by means of assisted reproduction"). Sullivan asserts that section 160.702 of the Texas Family Code deprives Russell of standing because, under that section, "a donor is not a parent of a child conceived by means of assisted reproduction." *See* Tex. Fam.Code Ann. § 160.702 (Vernon 2002).

It is undisputed that L.J.S. was conceived by means of assisted reproduction using Russell's sperm and that Russell and Sullivan are not married to each other. Nonetheless, Russell asserts that section 160.702 does not apply to a known donor of sperm who executed a "Co-Parenting Agreement" under which the donor intended to assume an active role as father of the child conceived by means of assisted reproduction. In the alternative, Russell asserts that, to the extent that section 160.702 is found to deprive him of parental status under these circumstances, it is unconstitutional under various theories.

Before reaching the issue of whether Russell is a donor who lacks parental rights, we first must determine whether, under the proper statutory construction, donor status [3] is part of the inquiry as to whether Russell has standing to maintain a parentage proceeding. If, under the statutory standing criteria, Russell has standing as a "man whose paternity of the child is to be adjudicated," even though, on the merits, the trial court may decide that he is a donor with no parental rights, then the

3. It is undisputed that Russell donated his sperm. Nonetheless, throughout this opinion, when we speak of the issue of whether Russell is a donor, we refer to the issue of whether Russell falls under the statutory definition of donor and therefore lacks parental rights under section 160.702. *See* Tex. Fam.Code Ann. §§ 160.102(6), 160.702.

issue of Russell's status as a donor is not relevant to standing, and this court must presume (for standing purposes only) that Russell's claims have merit, that is, that he is not a donor and that he has parental rights. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 554–55 (stating that court should not decide standing based on its views of the merits of the asserted claims). On the other hand, if the statute requires that men disprove donor status before they can have standing to maintain a parentage proceeding, then we must address whether Russell is a donor.

The term "man whose paternity of the child is to be adjudicated" is not defined in the Texas Family Code.[4] This term was created in the recent revisions to the Uniform Parentage Act ("UPA"). So far, only a few states have adopted these revisions, and research reveals no cases addressing the meaning of this statutory phrase. *See* UPA (2000), section 602. On its face, the term lacks clarity. This phrase seems to beg the question that it is intended to answer. We look to section 160.602 as the statutory standing provision to tell us who has standing to maintain parentage proceedings, yet this section states that all men have standing if their "parentage is to be adjudicated." This language presents a paradox. A man cannot seek an adjudication of his paternity unless he has standing, yet section 160.602 states that a man generally has no standing to seek an adjudication of his paternity unless his paternity is to be adjudicated. *See* Tex. Fam.Code Ann. § 160.102(9) (defining "intended parents" as "individuals who enter into an agreement providing that the individuals will be the parents of a child born to a gestational mother by means of assisted reproduction...."); Tex. Fam.Code Ann. § 160.751 (defining a "gestational mother" as "a woman who gives birth to a child conceived under a gestational agreement"); Tex. Fam.Code Ann. § 160.752, *et seq.* (defining gestational agreement as one in which woman agrees to give birth to child, relinquishing all of her parental rights regarding the child, so that the intended parents can be the child's parents); Tex. Fam.Code Ann. § 160.602 (granting standing only to men "whose paternity of the child is to be adjudicated," who are "related within the second degree by consanguinity to the mother of the child, if the mother is deceased," or who are an "intended parent").

In an attempt to determine the meaning of this perplexing and ambiguous statutory phrase, we consider the object sought to be obtained, the circumstances under which the statute was enacted, the legislative history, former statutory provisions, including laws on the same or similar subjects, and the consequences of a particular construction. *See* Tex. Gov.Code Ann. § 311.023 (Vernon 1998). The circumstances under which the statute was enacted and the legislative history indicate that, although Texas had not previously enacted the entire UPA, the Texas Legislature sought to enact the 2000 version of the UPA. *See* Act of May 25, 2001, 77th Leg., R.S., ch. 821, § 1.01, 2001 Tex. Gen. Laws 1610 (enacting legislation substantially similar to 2000 version of UPA); House Research Organization, Bill Analysis, Tex. H.B. 920, 77th Leg., R.S. (May 8, 2001) (stating that the intent of this legislation was to enact the 2000 version of the UPA). Beyond this, the circumstances under which the statute was enacted and the legislative history do not speak to the issue of which men have standing to maintain a parentage proceeding or to the meaning of the phrase "a man whose paternity of the child is to be adjudicated."

4. All statutory references herein are to the Texas Family Code unless otherwise stated.

Before the Texas Legislature enacted this legislation in 2001, Texas had no analogous standing statute regarding parentage proceedings. Because the Texas Legislature sought to enact the 2000 version of the UPA, we examine that uniform act and previous versions of the UPA.

The original UPA—the 1973 version—had a provision similar to section 702 of the 2000 UPA, under which a sperm donor had no parental rights. *See* UPA (1973), section 5. The very next section of the 1973 UPA dealt with who could bring an action to determine the existence of a father and child relationship. *See* UPA (1973), section 6. Under that section, for a child that had no presumed father, "a man alleged or alleging himself to be the father," among others, had standing to bring an action to determine the existence of the father and child relationship. *See* UPA (1973), section 6(c). The 1973 UPA allowed "[a]ny interested party" to bring an action as to children with presumed fathers under certain provisions of the UPA; however, as to children with presumed fathers under other provisions of the UPA, a putative father had no standing to initiate a proceeding. *See* UPA (1973), section 6(a), (b). The 2000 UPA eliminated this lack of standing as to certain putative fathers, in part due to considerations regarding the Federal Family Support Act of 1988. *See* UPA (2002), sections 602, 607 & cmts.

The Federal Family Support Act of 1988, as a condition for receiving federal matching funds to establish paternity and to enforce child support orders, requires states to maintain "[p]rocedures ensuring that the putative father has a reasonable opportunity to initiate a paternity action." *See* 42 U.S.C. § 666(a)(5)(L). The comment to the 2000 version of the UPA that Texas enacted in 2001 states that section 602 is based on section 6 of the 1973 UPA and "conforms to the mandate of 42 U.S.C.

§ 666(a)(5)(L) requiring that a putative father have a reasonable opportunity to initiate a paternity proceeding." UPA (2000), section 602 cmt. At the time the Texas Legislature adopted the 2000 UPA in 2001, the only comment that accompanied section 702 stated that its source was section 4(a) of the Uniform Status of Children of Assisted Conception Act. *See* UPA (2000), section 702 cmt. The Uniform Status of Children of Assisted Conception Act is short, states basic rules as to parental rights (including the principle that the donor is not a parent of a child conceived through assisted conception), and has no provisions that relate to procedural issues or to standing for maintaining parentage proceedings. *See* Uniform Status of Children of Assisted Conception Act (1988).

In 2002, after the Texas Legislature adopted the 2000 version of the UPA, the National Conference of Commissioners on Uniform State Laws adopted a revised version of the UPA. *See* UPA (2002). Although the text of sections 602 and 702 of the UPA remained the same, the 2002 version of the UPA changed the comments to these sections. *See* UPA (2002), sections 602, 702 cmts. These comments spawn confusion. The 2002 comment to section 602 removes the reference to the Federal Family Support Act of 1988, although it still refers to section 6 of the 1973 UPA as the source of this section. *See* UPA (2002), section 602 cmt. This comment also contains new language, including the following: "This section grants standing to a broad range of individuals and agencies to bring a parentage proceeding. But, several limitations on standing to sue are contained within the Act." *See id.* The comment then goes on to refer to articles 3 and 8 as well as sections 607 and 609 of the UPA, which apparently are other "limitations on standing to sue." *See id.* Although this comment seems to indicate that there are limitations on standing

in the revised UPA outside of section 602, the comment does not mention section 702 of the UPA as one of these limitations. *See id.* Further, several of the sections of the UPA to which the comment does refer do not appear to limit standing. *See id.* (referring to articles 3 and 8 and sections 607 and 609 of the UPA). Article 3 of the UPA deals with voluntary acknowledgment of parentage, which, once binding, may have issue or claim preclusion effect on the parentage question. Article 3, however, contains no apparent limitation on standing. *See* UPA (2002), article 3. Sections 607 and 609 of the 2002 UPA establish, in certain contexts, time limitations for bringing proceedings to adjudicate parentage, to disprove the father-child relationship regarding a presumed father, or to rescind an acknowledgment of parentage; however, these sections do not state that the parties in question lose standing. *See* UPA (2002), sections 607, 609. Section 807 of the UPA seems to limit the ability of a gestational mother to assert that she is the mother of a child to whom she gave birth under a court-validated gestational agreement.[5] *See* UPA (2002), section 807. Although this provision arguably might be a limitation on standing, it seems more akin to issue or claim preclusion.

As to section 702, the comment to the 2002 UPA contains the following statements, among others: "The donor can neither sue to establish parental rights, nor be sued and required to support the resulting child. In sum, donors are eliminated from the parental equation." *See* UPA (2002), section 702, cmt. This comment suggests that donors under section 702 have no standing, and Sullivan makes this comment the cornerstone of her argument that section 160.702 deprives Russell of standing. None of the comments to section 702 of the 2002 UPA, however, were in existence when the Texas Legislature adopted the relevant portions of sections 160.602 and 160.702 of the Texas Family Code in 2001. Furthermore, these are not comments made by lawmakers or any entity associated with the Texas Legislature. These are comments by nonlegislators, made after the Texas Legislature enacted the statute in question. Therefore, these statements are not legislative history, nor are they otherwise relevant to the statutory-construction issue at hand.[6] *See Chair King, Inc. v. GTE Mobilnet of Houston, Inc.,* 135 S.W.3d 365, 380 (Tex.App.-Houston [14th Dist.] 2004, pet. filed) (holding post-enactment statements by nonlegislators are irrelevant to interpretation of ambiguous statute); *see also Sullivan v. Finkelstein,* 496 U.S. 617, 631, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring in part) (stating that "post-enactment legislative history" is an oxymo-

5. Even if one construed article 8 of the UPA as eliminating the standing of a gestational mother to file a proceeding to adjudicate parentage as to a child born to her under a valid gestational agreement, this does not appear to support a similar reading of section 702 of the UPA. Though it might be an example of a limitation on standing that is not contained in section 602 of the UPA itself, article 8 differs significantly from article 7 of the UPA. Article 8 provides procedures independent from a parentage proceeding for intended parents to validate a gestational agreement and be declared parents of the child. *See* UPA (2000), article 8. Article 7 does not provide independent procedures, and, in fact, section 705 of the UPA indicates that a proceeding to adjudicate parentage is the way to resolve controversies over parentage in the assisted-reproduction context. *See* UPA (2000), section 705.

6. There is no indication that the 2002 comments were substantive, and these comments may be referring to "standing" in a looser sense, like that used in the comment to section 602, to refer to the ability to succeed on the merits, which is actually not standing at all. *See* UPA (2002), sections 602, 702, cmts.

ron and should not be considered in interpreting statutes and that even the proponents of its use limit it to statements from members of the legislative body that enacted the statute).

The 1973 version of the UPA allowed a man alleging himself to be the father of the child to maintain a parentage proceeding in cases, such as the one at hand, in which the child has no presumed father. *See* UPA (1973), section 6. The 2000 version of the UPA changed the standing language to "a man whose paternity of the child is to be adjudicated." *See* UPA (2000), section 602. Although the exact meaning of this phrase may be elusive, its language and the comment to section 602 of the 2000 UPA indicate that this phrase is at least as broad, if not broader than, "a man alleged or alleging himself to be the father." *See* UPA (2000), section 602 & cmt. If the Texas Legislature or the UPA drafters had intended to exclude donors from the class of those who have standing to maintain a parentage proceeding, they easily could have excluded donors from the group of men "whose paternity is to be adjudicated." *See, e.g.,* UPA (2000), section 102(3) (excluding male donors from definition of "alleged father," which definition is not used in section 602 but is used in other sections of the 2000 UPA); Tex. Fam.Code Ann. § 101.0015 (excluding male donors from definition of "alleged father" which term is used in various sections of the Texas Family Code, but not in section 160.602). The omission of such an exclusion from the statute suggests that our lawmakers intended a sperm donor to have standing as a man "whose paternity is to be adjudicated."

Because this court deemed the construction and constitutionality of the Texas Family Code provisions at issue in this case to be a matter of great public concern, we requested the Attorney General of Texas to submit an *amicus curiae* brief addressing the statutory construction and constitutional issues presented in this case. *See Commissioners' Court of Nacogdoches County. v. Weaver,* 141 S.W.2d 764, 770 (Tex.Civ.App.-Beaumont 1940), *rev'd on other grounds,* 135 Tex. 611, 146 S.W.2d 170 (Tex.Com.App.1941). Though relying on a different legal analysis, the Attorney General reached the conclusion that, under the Texas Family Code, Russell has standing to maintain this parentage proceeding.

Based on the language of the statute, the object sought to be obtained, the circumstances under which the statute was enacted, the legislative history, former statutory provisions, including laws on the same or similar subjects, and the consequences of the different constructions, we conclude that, at a minimum, section 160.602(3) confers standing on a man alleging himself to be the biological father of the child in question and seeking an adjudication that he is the father of that child. We further conclude that under the statute, as drafted, the issue of the man's status as a donor under section 160.702 is to be decided at the merits stage of the litigation rather than as part of the threshold issue of standing. It is undisputed that Russell alleges himself to be L.J.S.'s biological father and that he has filed a parentage proceeding seeking an adjudication that he is L.J.S.'s father. Based on our interpretation of the relevant statutes and the undisputed facts germane to the issue of Russell's standing, we conclude that, as a matter of law, Russell has standing to maintain a proceeding to adjudicate his parentage of L.J.S.

Sullivan argues forcefully that the Texas Family Code, in unambiguous language, confers no rights on known sperm donors, such as Russell, and that this is confirmed by the Texas Legislature's failure to adopt new language from the 2002 UPA that

would confer parental rights on men in Russell's situation. *See* UPA (2002), sections 703, 704. These arguments, however, go to the merits of this case, rather than showing that Russell lacks standing under section 160.602(3). The facts relevant to the issue of whether Russell is a donor without parental rights under section 160.702 appear to be undisputed. Because courts interpret statutes as a matter of law, trial and appellate courts would have the capability, if the law so provided, to expeditiously decide the issue of Russell's donor status as part of their determination of whether Russell has standing under section 160.602. The Texas Legislature, however, has not made the determination of donor status part of the standing inquiry. *See* TEX. FAM.CODE ANN. § 160.602. Because, at this juncture, the only issue is Russell's standing, the trial court, in ruling on Sullivan's plea to the jurisdiction, was prohibited from reaching the merits of Russell's claim that he is not a donor under section 160.702. *See Bland Indep. Sch. Dist.,* 34 S.W.3d at 554–55 (stating courts may not reach the merits of the parties' claims in deciding the issue of standing); *TAC Realty, Inc.,* 126 S.W.3d at 561–65 (stating that standing analysis is entirely separate from determination of merits and holding that trial court erred in determining legal issue of the constitutionality of the city's agreements, because that was a determination on the merits, which must not be reached in determining standing); *City of Dallas v. First Trade Union Sav. Bank,* 133 S.W.3d 680, 686 (Tex.App.-Dallas 2003, pet. filed) (holding that, in interlocutory appeal regarding city's plea to the jurisdiction, court could not address city's argument that bank's claims against city failed as a matter of law because court may not reach the merits of the claims in determining plea to the jurisdiction). Likewise, in ruling on Sullivan's petition for a writ of mandamus regarding standing, this court cannot and does not address the merits of Russell's claims, including his assertion that he is not a donor under section 160.702.[7] *See Bland Indep. Sch. Dist.,* 34 S.W.3d at 554–55; *TAC Realty, Inc.,* 126 S.W.3d at 561–65; *First Trade Union Sav. Bank,* 133 S.W.3d at 686.

It is the role of the Texas Legislature to decide whether Texas public policy would be best served by requiring men to show they are not donors before they can have standing to maintain a parentage proceeding. This court must interpret and construe the statute as written; we may not invade the legislative field. At present, the Texas Family Code confers standing on Russell. *See* TEX. FAM.CODE ANN. § 160.602. Unless and until the Texas Legislature amends the Texas Family Code to achieve the result Sullivan urges, there is no basis to deny standing in this type of case. Accordingly, we find no grounds for mandamus relief.

## IV. CONCLUSION

The merits of Russell's parentage proceeding raise important issues of apparent

7. On rehearing, both Sullivan and Russell have submitted filings in which they attribute to this court various holdings and rulings that far exceed the scope of our opinion. To eliminate the parties' apparent confusion about the nature and scope of this court's decision in this case, we note the following:
   - This court has taken no position on the validity or enforceability, if any, of the "Co-Parenting Agreement" signed by Sullivan and Russell.
   - This court has not based its determination that Russell has standing on the "Co-Parenting Agreement."
   - This court has not held that the trial court should determine the effect, if any, of the "Co-Parenting Agreement" by means of an exercise of the trial court's discretion.
   - This court has not indicated that the merits of cases such as this one should be decided by the trier of fact on a case-by-case basis.

first impression under Texas law. However, under the standing statute enacted by the Texas Legislature, we are unable to decide these important issues in determining the standing issue that is before this court. *See* Tex. Fam.Code Ann. § 160.602; *Bland Indep. Sch. Dist.*, 34 S.W.3d at 554–55; *TAC Realty, Inc.*, 126 S.W.3d at 561–65; *First Trade Union Sav. Bank*, 133 S.W.3d at 686. Because Russell is a man alleging himself to be L.J.S.'s biological father and seeking an adjudication that he is her father, we conclude that section 160.602 of the Texas Family Code confers standing on Russell to maintain a parentage proceeding. Accordingly, we deny Sullivan's petition for writ of mandamus.

HEDGES, C.J., concurring.

ADELE HEDGES, Chief Justice, concurring.

While I join the majority's holding and disposition, I respectfully disagree with its reasoning in reaching its conclusion. Today the majority concludes that the real party in interest, Brian Keith Russell, has standing under Chapter 160 of the Texas Family Code to establish his paternity of a child conceived through artificial insemination from the donation of his sperm to an unmarried woman, relator Sharon Elizabeth Sullivan. Because the plain and ordinary meaning of the relevant statutory provision in that chapter clearly confers standing upon a party such as Russell in the present case, I respectfully concur.

***Standing Under Section 160.602***

Standing to sue may be predicated upon either statutory or common-law authority. *See Williams v. Lara*, 52 S.W.3d 171, 178–79 (Tex.2001). When standing is conferred by statute, the text of the operative provision and the case law interpreting it serve as the proper framework for the analysis. *DaimlerChrysler Corp. v. Inman*, 121 S.W.3d 862, 869 (Tex.App.-Corpus Christi 2003, pet. filed). Sullivan claims that no provision within the Family Code confers standing upon Russell. I do not agree.

Section 160.602 provides: "Subject to Subchapter D [Texas Family Code § 160.301–316] and Sections 160.607 and 160.609 and except as provided by Subsection (b), a proceeding to adjudicate parentage may be maintained by: ... (3) a man whose paternity of the child is to be adjudicated...." Tex. Fam.Code Ann. § 160.602(a)(3) (Vernon Supp.2004–2005). Russell's petition states as follows: "A purpose of this suit is to establish the parent-child relationship between BRIAN KEITH RUSSELL and the child, the subject of this suit." Therefore, Russell would clearly have standing under section 160.602 unless some other section of Chapter 160 states otherwise.[1]

***Statutory Text of Section 160.702***

Sullivan next claims that the plain language of section 160.702 negates any standing Russell may have been granted under section 160.602. Section 160.702 provides: "A donor *is not* a parent of a child conceived by means of assisted reproduction." Tex. Fam.Code Ann. § 160.702 (Vernon 2002) (emphasis added).

The primary rule of statutory interpretation is to ascertain and give effect to the intent of the Texas Legislature. *Phillips v. Beaber*, 995 S.W.2d 655, 658 (Tex.1999). If the statute is unambiguous, we are required to seek this intent in the plain and common meaning of its words and not

1. In the event of any conflict between a Chapter 160 provision and another state statute or rule, the former prevails. Tex. Fam.Code Ann. § 160.002 (Vernon 2002).

elsewhere. *See Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 352 (Tex.1990).

The "plain and common meaning" of section 160.702 does not negate Russell's standing under section 160.602. Rather, section 160.702 states only that one's status as a mere donor does not establish in and of itself the existence of a parent-child relationship between the donor and the child resulting from assisted reproduction. It does *not* state that a donor can *never* be a parent under appropriate circumstances. Perhaps Sullivan's construction of this provision would be accurate if the statute had provided, "A donor *cannot be* a parent of a child conceived by means of assisted reproduction." But that language does not appear in section 160.702, and Sullivan's construction cannot be reached based on the plain and common meaning of the provision as enacted. In the present case, Russell does not claim that he is a father based solely on his status as a donor; rather, he alleges paternity of the child based on a "written co-parenting agreement." [2] Therefore, Russell's standing is not negated by section 160.702 because the language simply does not bear the meaning Sullivan ascribes to it.

### Conclusion

Because section 160.602 of the Family Code broadly confers standing upon Brian Keith Russell in the present case and no other provision in Chapter 160 negates such standing, the trial court did not err in denying relator Sharon Elizabeth Sullivan's plea to the jurisdiction. Accordingly, I concur in the majority's denial of her petition for writ of mandamus.

2. The question of whether the "written co-parenting agreement" suffices to confer the status of parenthood is not before us. I express no opinion on whether Russell will ultimately prevail in the trial court. I only recognize his standing to try.